I concur with the majority's conclusion that attempts by Governor Fordice to partially veto House Bills 1613 and 1502 by substituting his figures for those of the Legislature were unconstitutional acts, and therefore, a nullity. The Governor's acts were unconstitutional because of the manner in which he exercised his partial veto, not because the bills were labeled as "revenue bills." Since form should not rule substance, I cannot agree that House Bills 1613 and 1502 did not appropriate funds merely because those bills also raise revenue.
Also, I agree with that part of Chief Justice Hawkins' separate opinion which finds that review of the twenty-seven other bills by this Court is unnecessary. The Governor did not brief the issues involving those bills, and he accepted the chancellor's decision regarding those twenty-seven bills as a binding final decision.
 I.
The case sub judice requires consideration of several constitutional provisions. The relevant provisions of Article 4 of the Mississippi Constitution of 1890, which are pertinent to analysis and discussion, are as follows:
 Section 63. No appropriation bill shall be passed by the legislature which does not fix definitely the maximum sum thereby authorized to be drawn from the treasury.
 Section 64. No bill passed after the adoption of this Constitution to make appropriations *Page 1006 
of money out of the state treasury shall continue in force more than two months after the expiration of the fiscal year ending after the meeting of the legislature at its next regular session. . . .
 . . . .
 Section 72. Every bill which shall pass both Houses shall be presented to the Governor of the state. If he approve, he shall sign it; but if he does not approve, he shall return it, with his objections, to the House in which it originated. . ..
 Section 73. The governor may veto parts of any appropriation bill, and approve parts of the same, and the portions approved shall be law.
In interpreting and construing our Constitution, we should be ever mindful of the wisdom of past jurists. As expressed by Judge Learned Hand:
 There is no more likely way to misapprehend the meaning of language — be it in a constitution, a statute, a will or a contract — then to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen. That there are hazards in this is quite true; there are hazards in all interpretation, at best a perilous course between dangers on either hand; but it scarcely helps to give so wide a berth to Charybdis' maw that one is in danger of being impaled upon Scylla's rocks.
Central Hanover Bank Trust Co. v. Commissioner, 159 F.2d 167, 169 (2d Cir. 1947).
 II.
The appellees contend that the title of House Bills 1613 and 1502, as bond bills (revenue bills), should be indicative of the purpose and effect of those bills. However, simply labeling House Bills 1613 and 1502 solely as "revenue bills" does not eradicate language from those bills which does, in fact, appropriate money for special projects. The title of a bill is not conclusive, but merely advisory in nature, and may be misleading. See Roseberry v. Norsworthy, 135 Miss. 845, 100 So. 514 (1924). It is not decisive whether the Legislature voted on those bills as "revenue bills" or as "appropriation bills." Legislative intent cannot be gleaned from the nature of such a vote on House Bills 1613 and 1502. Since those bills are hybrids, achieving the raising of revenue and appropriations for special projects, voting on the bills as either "revenue bills" or "appropriation bills" would not displace the actual effect of the bills, whether it be for raising revenue, appropriating funds, or both.
It does little justice to obtusely focus only upon the language of House Bills 1613 and 1502 which authorize the raising of revenue for projects, while simultaneously ignoring the remaining language of those bills. The draftsman of House Bills 1613 and 1502 did not limit the elements or effects of those bills to the parameters set forth in Miss. Const. art. 4, §§ 63, 64 and 69. The language of those two bills does more than appropriate, but that does not mean that those bills did not have contemplated appropriative effect. An examination of House Bills 1613 and 1502 leaves little doubt that those bills were intended to accomplish two tasks, both to raise revenue and appropriate those revenues for expenditure to offset the costs of special projects.[1]
Whether a singular legislative bill may constitutionally appropriate funds under the umbrella of a "revenue bill" is not the question addressed by the majority in this case, and I, therefore, do not endeavor to express my views on that subject. But, if hybrid bills such as House Bills 1613 and 1502 are not constitutionally infirm, then the Governor may veto parts of those bills which have appropriative effect, provided he do so properly. However, the Governor's attempt at partial veto was not proper in this instance, and is, therefore, a nullity. See Statev. Holder, 76 Miss. 158, 23 So. 643 (1898).
 III.
"It [Section 73] applies to such as are made up of parts and consists of portions *Page 1007 
separable from each other as appropriations." Id., 23 So. at 644. The dispositive question, in determining applicability of the Governor's § 73 veto power, should not be whether House Bills 1613 and 1502 are solely appropriations bills or solely revenue bills. Instead, the analysis centers on whether the bills do, in fact, appropriate, regardless of whether they accomplish other tasks or go beyond the parameters of §§ 63, 64 and 69. "Every bill of the character in question has three essential parts: The purpose of the bill, the sum appropriated for the purpose, and the conditions upon which the appropriation shall become available." Id., 23 So. at 645.
The two bills under consideration plainly satisfy the Holder
criteria. Each bill: 1) states the purpose of the funds appropriated and to be expended; 2) states the maximum amount appropriated and to be expended for each project; and 3) conditions the availability and expenditure of the appropriated funds upon the issuance of warrants.
Nevertheless, the appellees contend that, because House Bills 1613 and 1502 raise revenue and create debt to be repaid by an uncertain amount in the future, House Bills 1613 and 1502 cannot also appropriate funds. But, instead of drafting a bill which is exclusively a revenue bill or exclusively an appropriation bill, the architect of House Bills 1613 and 1502 wandered astray and incorporated the purpose and effect of both revenue raising and appropriations into those two bills.
Neither our Constitution, our statutes nor our cases define an "appropriation bill," however, the New Jersey Supreme Court provides a helpful definition, as follows: "An appropriation is an authorization, statutorily enacted by the Legislature, for the withdrawal of monies from the State treasury for governmental purposes." Karcher v. Kean, 97 N.J. 483, 479 A.2d 403, 407 (1984). Other jurisdictions have held similarly:
 It is well settled that no special form of language is required to make an appropriation. If it be the intent of the appropriating body that the money in question be paid, it makes no difference in what terms such intent is expressed.
Crawford v. Hunt, 41 Ariz. 229, 17 P.2d 802, 804 (1932).Accord, People v. Goodykoontz, 22 Colo. 507, 45 P. 414, 415 (1896) (no set form of words are required in order to constitute an appropriation, so long as it is clear that intent to appropriate funds is present); Campbell v. Commissioners,115 Ind. 591, 18 N.E. 33, 34 (1888) (an appropriation may be made even in the absence of a formal declaration as such).
House Bill 1613 listed expenditures for numerous projects, but set a maximum amount to be spent on those selected projects at $65,882,979.00, stating that such funds "shall be disbursed, inthe discretion of the Department of Finance and Administration,to pay the costs of capital improvements, renovation and/orrepair of existing facilities, furnishing and/or equippingfacilities of state institutions of higher learning and communityand junior colleges, and purchasing real property for publicfacilities for the Board of Trustees of State Institutions ofHigher Learning. . . ." (emphasis added). Likewise, House Bill 1502 allocated a total of $8,000,000.00 to be spent in various amounts on fourteen different projects, stating that the funds "shall be allocated and disbursed, through the Department ofFinance and Administration, based upon the recommendations of theBoard of Trustees of the Department of Archives and History, topay the costs associated with each project. . . ." (emphasis added).
House Bills 1613 and 1502 clearly appropriate. "Section 73 of the constitution relates to general appropriation bills, orthose containing several items of distinct appropriations. . . ."State v. Holder, 76 Miss. 158, 180, 23 So. 643, 644 (1898) (emphasis added). A fortiori, the Governor's partial veto power derived from Miss. Const. art. 4, § 73, is applicable to all bills which have appropriative effect, not just those bills which are labeled as "appropriation bills."
Furthermore, the requirements of Miss. Const. art. 4, § 63 were met by both bills. But, instead of recognizing the stated maximum amounts of the appropriation portions of House Bills 1613 and 1502, the majority contends that unknown interest rates and dates of maturity on the bonds authorized by *Page 1008 
the revenue raising portions of those bills prevent satisfaction of the § 63 requirement of a fixed maximum sum authorized to be drawn from the treasury. That contention simply avoids confronting the issue.
The § 64 requirement is more troublesome, however. House Bills 1613 and 1502 do not expressly prohibit the Department of Finance and Administration from expending appropriated funds after the expiration of the time parameters established by § 64. Nevertheless, that issue is not on appeal to this Court, and is not decided this day. Accordingly, the majority does not decide whether a bill which does not facially conform with § 64 would expire or be ineffective beyond "two months after the expiration of the fiscal year ending after the meeting of the Legislature at its next regular session," or, alternatively, void from its inception. If such bills simply expire after the requisite § 64 time period, then House Bills 1613 and 1502 satisfy § 64 until "two months after the expiration of the fiscal year ending after the meeting of the Legislature at its next regular session." However, if House Bills 1613 and 1502 abrogate the § 64 time requirement, so as to frustrate the constitutional purpose of that section, then the language which appropriates funds for special projects and authorizes the Department of Finance and Administration to expend those funds on a continuing basis would cause those bills to be constitutionally infirm. But, this Court, today, does not squarely address the constitutionality of House Bills 1613 and 1502.
Quite simply, the Legislature, in House Bills 1613 and 1502, mandated and authorized the expenditure of $65,882,979.00 and $8,000,000.00, respectively, by the Department of Finance and Administration, and no future appropriation bill or further action by the Legislature was required for the Department of Finance and Administration to spend the designated amounts of the monies of the taxpayers and citizens of Mississippi. But, without such legislative action, the Department of Finance and Administration would not have authority to make the expenditures for the enumerated special projects. Assuming that House Bills 1613 and 1502 are not unconstitutional, the foregoing is a definition of legislative action embodied within a bill which appropriates. Therefore, House Bills 1613 and 1502 appropriated, and were subject to the Governor's § 73 partial veto power.
 IV.
Here, House Bill 1613 began as a bill that authorized the issuance of general obligation bonds of the State of Mississippi in the amount of $2,000,000.00, and appropriated the funds derived from the sale of those bonds for the purpose of repairing storm damage to the Mississippi University for Women campus caused by a tornado. After numerous amendments, the final version of House Bill 1613 that was enacted by the Legislature had grown tremendously, and was sent to the Governor for his approval or veto. It authorized the issuance of bonds in the amount of $65,882,979.00, and appropriated the funds to be derived from the sale of those bonds for expenditures on individual projects atall Mississippi universities and community or junior colleges,
such individual project costs totalling $65,882,979.00.
House Bill 1502 experienced similar growth through the legislative amendment process. It began as a bill to authorize the issuance of $5,350,000.00 in bonds, and which appropriated the proceeds from the sale of those bonds for the acquisition, development, improvement or renovation of eight sites of historical significance throughout Mississippi. As finally enacted by the Legislature and sent to the Governor, the bill provided authorization for the issuance of $8,000,000.00 in bonds, and the proceeds of the sale of those bonds were appropriated for thirteen historical sites, in additional to twenty-five more historic sites which were deemed eligible for funding.
 V.
A fair reading of Mississippi's Constitution yields the conclusion that the drafters of our Constitution obviously intended that a system of checks and balances exist between the power of the Legislature to determine what amounts of the citizens' funds should be appropriated and spent from the state treasury, and the power of the Governor to disapprove *Page 1009 
of certain expenditures by partial veto. The Legislature should not be allowed to subvert the Governor's constitutional § 73 veto power by filling a bill with language that has appropriative effect, but which also adds elements that would defeat the definition of a wholly exclusive appropriation bill. If a portion of a bill, in fact, appropriates, that portion of the bill is subject to the Governor's § 73 partial veto power, regardless of the label placed upon the bill. Otherwise, the Governor would be forced to veto the entire bill, perhaps stalling proper funding of projects which he and the Legislature agree upon, merely because the projects are included in a hybrid bill.
Miss. Const. art. 4, § 73 serves as a safeguard against mushrooming omnibus legislative bills by empowering the Governor with partial veto power. We have previously recognized the purpose and legitimacy of § 73, stating that:
 Section 73 was framed with a view of guarding against the evils of omnibus appropriation bills securing unrighteous support from diverse interests, and to enable the governor to approve and make law some appropriations, and to put others to the test of securing a two-thirds vote of the legislature as the condition of becoming law. Thus viewed, section 73 is eminently wise, and will prove useful in practice, as corrective of an evil. . . .
State v. Holder, 76 Miss. 158, 180, 23 So. 643, 644 (1898).
Instead of vetoing House Bills 1613 and 1502 in their entirety by utilizing his § 72 veto power, the Governor attempted to use his § 73 partial veto power, vetoing certain projects but approving others. The Governor attempted to limit the expenditures of House Bill 1613 to a total expenditure of $8,306,979.00. Likewise, he attempted to reduce House Bill 1502 to a total expenditure of $5,150,000.00.
However, the Governor's attempts were constitutionally flawed. While the Governor may properly veto separate "parts" of any language in a legislative bill which has as its purpose the "appropriation" of funds, he may not legislate by substituting his own figures for those of the Legislature. Here, the Governor transgressed into the realm of legislating by making such substitutions in House Bills 1613 and 1502.
According, I concur that the Governor did not properly exercise his § 73 partial veto power, as it concerns House Bills 1613 and 1502. However, § 73 is applicable to all omnibus appropriative bills of the Legislature.
SMITH, J., joins in part in this opinion. *Page 1010 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1011 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1012 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1013 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1014 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1015 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1016 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1017 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1018 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1019 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1020 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1021 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1022 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1023 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1024 
[EDITORS' NOTE: APPENDIX A IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1025 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1026 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1027 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1028 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1029 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1030 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1031 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1032 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1033 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1034 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1035 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1036 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1037 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1038 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1039 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1040 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1041 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1042 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1043 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1044 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1045 
[EDITORS' NOTE: APPENDIX B IS ELECTRONICALLY NON-TRANSFERRABLE.]
[1] A copy of House Bill 1613 and 1502, as well as the accompanying return transmittal letters from the Governor, are attached as Appendix "A" and Appendix "B" to this opinion, respectively. *Page 1046